USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: MAR 18 2016

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

Marichu De Sesto,

        Plaintiff,

—v—

Elyse Slaine,

        Defendant.

15-cv-1118 (AJN)

ORDER

---

ALISON J. NATHAN, District Judge:

    Marichu De Sesto served as a nanny and housekeeper to Elyse Slaine for almost fourteen years, ending in 2014. De Sesto brought this suit against Slaine for unpaid overtime wages under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and New York Labor Law ("NYLL"); unpaid wages and failure to provide paystubs under NYLL; and breach of contract. Slaine, in turn, accuses De Sesto of inflating her hours worked during the course of her employment, and of organizing tortious protests in front of her residence. Based on these accusations, Slaine brings counterclaims alleging common law fraud, unjust enrichment, breach of fiduciary duty, civil theft, and intentional and negligent infliction of emotional distress. Before the Court today is De Sesto's motion to dismiss the counterclaims, and to strike a number of Slaine's affirmative defenses. For the reasons below, De Sesto's motion is granted in part and denied in part.

    I.    **Background**

    The parties agree on this much: Elyse Slaine and her then-husband David Slaine hired Marichu De Sesto in July of 2000 to work as a housekeeper and as a nanny for their daughter.

Compl. ¶ 14; Answer ¶ 115. De Sesto worked—first for the Slaines, then after the couple separated, for Elyse Slaine—until May 16, 2014. Compl. ¶¶ 35–36; Answer ¶¶ 117–18. From here, the accounts diverge. The facts below are contested, and the citations will indicate which pleading (and thus whose account) they are sourced from.

### A. De Sesto's Employment

According to the Complaint, De Sesto regularly worked between thirteen to sixteen-and-a-half hours per day in her capacity as Slaine's housekeeper and nanny. Compl. ¶¶ 19–20. She claims to have worked five days per week from June 2007 through December 2013, and four days per week from January to May in 2014. *Id.* ¶¶ 16, 18. For this work De Sesto received $170 per day, which was increased to $200 per day in September 2013. *Id.* ¶ 17. De Sesto alleges that her employers never stated that her salary covered overtime pay, and that she never received overtime pay or paystubs. *Id.* ¶¶ 15, 30, 33. In her account, the Slaines separated in 2010. *Id.* ¶ 36. She claims that prior to 2010, the Slaines would typically wait two weeks before paying her wages, and that after the separation, Elyse Slaine would take a month or more to pay De Sesto's wages. *Id.* ¶ 35. De Sesto's employment ended on May 16, 2014, and De Sesto believes that she was terminated because of her health and in connection with a request for medical leave. *Id.* ¶ 36 & n.1. In addition to failure to pay overtime, De Sesto also alleges that Slaine refused to pay her for any of her hours worked in May 2014. *Id.* ¶ 37.

In Slaine's telling, the couple separated in 2008. Answer ¶ 117. Slaine agrees that after the separation, she changed the schedule on which she paid De Sesto. *Id.* ¶ 118. However, she claims that De Sesto requested payment at longer time intervals, rather than on a biweekly basis. *Id.* The arrangement, according to Slaine, was that De Sesto would record her hours and submit the amounts owed to Slaine on pay days chosen by De Sesto. *Id.* De Sesto requested this

2

schedule to help her save money, Slaine claims, but she now believes that De Sesto wanted a way to more easily obscure the actual hours that she was working. *Id.* ¶¶ 119, 124. Slaine alleges that from 2009 onwards, De Sesto consistently inflated her expenses and the hours that she was working when she reported her schedule, in order to fraudulently extract excess payments. *Id.* ¶ 125. The answer includes an attachment entitled "Schedule A." Schedule A consists of a listing of checks paid by Slaine to De Sesto. For each check, Schedule A lists the date, the check number, and the amount, along with an alleged overpayment amount. In total, Schedule A alleges that De Sesto was paid $51,722.95 for hours she did not work and expenses she did not incur. Since Slaine denies that she owes De Sesto any overtime pay, she is alleging that De Sesto has sought to overcharge her twice: first (successfully) through contemporaneous overreporting of hours worked and expenses incurred, and then a second time through filing this lawsuit seeking unpaid overtime wages. Slaine alleges that De Sesto quit on May 16, 2014. *Id.* ¶ 131.

### B. Protests at Slaine's Residence

Slaine's account continues into the aftermath of the end of De Sesto's employment. De Sesto organized a protest outside Slaine's Manhattan residence on October 29, 2014. *Id.* ¶ 132. Flyers distributed at the protest included a large photograph of Slaine with the large-print legend "Elyse Slaine: **WAGE THIEF!**" *Id.* ¶ 134. Other flyers stated

> We are marching today in support of Filipina domestic work [sic] Marichu De Sesto, whose wages have been stolen from her by millionaire socialite Elyse Slaine . . . Marichu is leading today's march to the home of her former Park Avenue employers. There we will deliver a demand letter for her unpaid and overtime wages. Marichu will speak out about her years of long hours, unpaid overtime and abrupt termination after requesting time off for medical reasons.

3

*Id.* ¶ 135–36. Slaine alleges that these flyers contained false statements, and that De Sesto knew they were false. *Id.* ¶ 137.

The protests were led by Leah Obias of the organization Damayan. *Id.* ¶ 144. During the protests, Obias threatened that protesters would "be back here every day until [Slaine] pays. We're gonna continue a long term campaign, a publicity campaign, until Elyse Slaine, wage thief pays Marichu her wages." *Id.* ¶ 146. Obias shouted Slaine's name into a bullhorn and called on her to come down and face the "angry mob," while a rented marching band played loud music. *Id.* ¶ 147. Demonstrations consisting of chants and distribution of flyers continued on a daily basis for an unspecified period of time. *Id.* ¶ 148. And posts were made on social media encouraging protestors to appear in front of Slaine's residence until she would agree to pay De Sesto. *Id.* Slaine alleges that the purpose of these protests was to coerce her to pay De Sesto money to which De Sesto knows she is not entitled. *Id.* ¶ 145.

One individual involved in the protest was Ben Becker, who sent a letter to Slaine's home on behalf of an organization called "Justice First," and who handed out fliers on the doorstep of Slaine's building. *Id.* ¶ 140. Becker, Slaine alleges, is the regional organizer for an anti-Zionist organization named A.N.S.W.E.R., and was an organizer and speaker at an anti-Zionist rally in Times Square last year where swastikas were displayed, and Israel compared to Nazi Germany. *Id.* ¶¶ 141–42. Slaine also claims that members of an anti-Semitic, anti-Zionist group called Al-Awda participated in the rally, including one Lamis Deek. *Id.* ¶ 143. Deek is a board member and co-founder of an affiliate of the Council on American-Islamic Relations called CAIR-NY. *Id.*

Slaine claims that De Sesto, knowing that Slaine is Jewish and the daughter of a holocaust survivor, enlisted these individuals and groups for the purpose of causing Slaine

4

distress. *Id.* ¶ 138. As a result of the protests, Slaine states that she has suffered extreme emotional distress, manifested as insomnia, loss of enjoyment of life, severe weight loss, extreme public embarrassment, pain, suffering, and mental anguish. *Id.* ¶¶ 150–51.

De Sesto filed suit on February 17, 2015.[1] Elyse Slaine answered and filed counterclaims on April 22, 2015. De Sesto moved to dismiss the counterclaims and strike certain affirmative defenses on June 5, 2015. The Court turns to De Sesto's motion now.

## II.   Motion to Dismiss Counterclaims

Slaine brought six counterclaims against De Sesto. Four—common law fraud, unjust enrichment, breach of fiduciary duty, and civil theft (collectively the "overreporting counterclaims")—all arise from the same set of factual allegations: De Sesto's alleged over-reporting of her hours and expenses while she worked for Slaine. The remaining two, intentional and negligent infliction of emotional distress, arise from the protests and their alleged effects on Slaine. De Sesto moves to dismiss the first four claims for failure to meet the pleading requirements of Rule 9(b), and all six for failure to meet the requirements of Rule 8(a).

### A. Legal Standard

When a party moves to dismiss under Rule 12(b)(6), the pleading will withstand the motion so long as it alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

---

[1] Initially, David and Elyse Slaine were both defendants in this action. However, David Slaine was dismissed from the case by stipulation of the parties on July 9, 2015. Dkt. No. 33.

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

Regardless of the level of factual detail provided, if "the allegations in a complaint, however true, could not raise a claim of entitlement to relief," then the Court will dismiss the case. *Twombly*, 550 U.S. at 558. A court evaluating a motion under Rule 12(b)(6) must "accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009). However, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

Although pleading most claims requires only that a party provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), claims of fraud are required by Rule 9(b) to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Specifically, a party alleging fraud must "(1) specify the statements that the [claimant] contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006). In addition to those elements that must be pleaded with particularity, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Rule 9(b) is implicated not only by direct allegations of fraud, but for "all averments of fraud or mistake, whatever may be the theory of legal duty—statutory, common law, tort, contractual, or fiduciary." *In re Harbinger Capital Partners Funds Inv'r Litig.*, No. 12-cv-1244, 2015 WL 1439520, at *10 (S.D.N.Y. Mar. 30, 2015); *see also Rombach v. Chang*, 355 F.3d 164, 172 (2d

Cir. 2004) (applying Rule 9(b) when "wording and imputations of the complaint are classically associated with fraud").

### B. The Overreporting Counterclaims

De Sesto argues that the overreporting counterclaims fail to meet the heightened pleading requirements of Rule 9(b). Specifically, she claims that (1) Slaine fails to identify any specific misrepresentations, (2) Slaine fails to explain the reasons why De Sesto's requests for payment were fraudulent, and (3) Slaine fails to state when the alleged misrepresentations were made. De Sesto Br. at 3. The first and third arguments are unavailing. Slaine alleges that De Sesto would request payment for monies she was not owed. Answer ¶ 125. De Sesto would, "with rare exceptions," receive a check on the same date that she requested payment. *Id.* ¶ 127. Schedule A contains a list of checks by date, and includes the amount of overpayment. The misrepresentations identified, therefore, are the requests for payment, and they occurred on the dates set out in Schedule A. De Sesto's second argument, however, is correct.

Rule 9(b) requires a claimant to "state with particularity the specific facts in support of [her] belief that defendants' statements were false when made." *Rombach*, 355 F.3d at 172 (brackets omitted); *see also Litchhult v. USTRIVE2, Inc.*, No. 10-cv-3311, 2011 WL 3877084, at *6 (E.D.N.Y. Sept. 1, 2011) (collecting cases). Slaine alleges that De Sesto's requests were fraudulent because they exceeded the amounts properly owed as shown in Schedule A. Slaine then states generally that De Sesto requested these overpayments "for periods [she] did not work or expenses [she] did not incur, or requested payment twice for the same work period . . . or expenses." Answer ¶ 125. This is not adequate. Slaine's Schedule A is simply a list of conclusory declarations that De Sesto's payment requests were fraudulently overstated. But nowhere in the Answer does Slaine explain what the basis is for her belief that her proposed

amounts are accurate and that De Sesto's requests were fraudulent. *See Litchhult*, 2011 WL 3877084, at *6.

Slaine has two responses. First, she states that the reason the statements were false is that they were made "to distort the amount of hours worked in order to steal money from defendant." Slaine Br. at 6. This betrays a misunderstanding of the question posed by the relevant portion of Rule 9(b). Her explanation is simply a description of De Sesto's motive, not any sort of factual allegation explaining why Slaine believes the reported hours and expenses were false. Slaine's second response is that she is not required to provide evidence establishing what hours and expenses De Sesto was actually owed compensation for until summary judgment. *Id.* at 7. True enough, but that does not free her of her burden to make specific factual allegations supporting her belief that the amounts in the "overpayment" column of Schedule A are correct, and the amounts actually paid were overinflated. Her failure to do so is a failure to meet the particularity requirement of Rule 9(b).

Because the four overpayment counterclaims all arise from the same facts and the same allegedly fraudulent actions, they rise and fall together under the heightened pleading standard for claims of fraud. Slaine's allegations are not sufficient to plead fraud with particularity under Rule 9(b). The four overpayment counterclaims are therefore dismissed. However, Slaine has requested leave to replead. Slaine Br. at 24. "The Court concludes that leave to replead is appropriate in this case because this is the type of pleading defect which [Slaine] may be able to correct." *Litchhult*, 2011 WL 3877084, at *7 (citing *Wolf v. Wagner Spray Tech Corp.*, 715 F. Supp. 504, 508 (S.D.N.Y. 1989)).

8

### C. Emotional Distress

The remaining two counterclaims allege that the protest campaign De Sesto organized against Slaine intentionally or negligently caused her emotional distress.

#### 1. Intentional Infliction of Emotional Distress

To state a claim for intentional infliction of emotional distress, a party must allege "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996) (citing *Howell v. New York Post Co.*, 81 N.Y.2d 115, 121 (1993)). Conduct satisfying the first element of the tort must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Conboy v. AT&T Corp.*, 241 F.3d 242, 258 (2d Cir. 2001). "Whether the conduct alleged may reasonably be regarded as so extreme and outrageous as to permit recovery is a matter for the court to determine in the first instance." *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999). When pleading intentional infliction of emotional distress, "[t]he bar is extremely high, and this highly disfavored cause of action is almost never successful." *Guan N. v. NYC Dep't of Educ.*, No. 11-cv-4299, 2013 WL 67604, at *25 (S.D.N.Y. Jan. 7, 2013). Indeed, such claims are "routinely dismissed on pre-answer motion." *Id.*

Slaine's allegations regarding the protests are limited. A protest was held outside her residence on October 29, 2014, and further protests occurred on unspecified additional days. Answer ¶¶ 132, 148. At the protest, flyers were handed out, banners were waved, a marching band played, and a woman using a megaphone yelled Slaine's name and demanded that she come out and face the protestors. *Id.* ¶¶ 134–36, 146–47. Slaine received a letter with

9

unspecified contents from the organization Justice First. *Id.* ¶ 140. She describes the letter as "threatening," but this is a conclusory statement unsupported by any factual allegation. *See id.* The purpose of these protests was to induce Slaine to pay the wages to which De Sesto claims she is entitled. *Id.* ¶ 146.

Slaine also alleges that one individual involved with an anti-Zionist organization and some members of an anti-Zionist, anti-Semitic organization participated in the protests. *Id.* ¶¶ 140–43. However, Slaine does not suggest that any of these people were present in their capacity as members of such organizations, that they committed any anti-Zionist or anti-Semitic acts during the protests, or that the protests had any anti-Zionist or anti-Semitic character. Nor does Slaine allege that she had any idea at the time who these people were or what organizations they participated in outside of the protest.

Understood in this context, what Slaine alleges is a labor protest of a sort that is not "utterly intolerable in a civilized society." *Conboy*, 241 F.3d at 258. While Slaine understandably found the protest irritating and disruptive, even troubling or frightening, "conduct that causes inconvenience and embarrassment or places a person in an uncomfortable situation for a protracted time is not sufficient" to state a claim for intentional infliction of emotional distress. *Assocs. First Capital v. Crabill*, 51 A.D.3d 1186, 1188 (N.Y. 3d Dep't 2008). Nor are Slaine's allegations that De Sesto misrepresented what she is owed enough to make the protest tortious. *See id.*

Slaine cites a number of cases in which she alleges that comparable misdeeds were sufficient to enable intentional infliction of emotional distress claims to survive a motion to dismiss. *See Flatley v. Hartmann*, 138 A.D.2d. 345, (N.Y. 2d Dep't 1988) (repeated hang-up phone calls); *Halio v. Lurie*, 15 A.D.2d 62 (N.Y. 2d Dep't 1961) (man sent mocking poem to

10

jilted girlfriend); *Blair v. Union Free Sch. Dist. No. 6*, 67 Misc. 2d 248 (Dist. Ct. Suffolk Cty. 1971) (confidential information leaked by police and school officials); *Flamm v. Van Nierop*, 56 Misc. 2d 1059 (Westchester Cty. Sup. Ct. 1968) (harassment in public, tailgating, prank phone calls); *Waldron v. Rotzler*, 862 F. Supp. 763 (N.D.N.Y. 1994) (harassment and discrimination).

The Second Circuit has identified *Flatley*, *Flamm*, and *Halio* as cases "that appear to allege conduct that is somewhat less than 'utterly intolerable in a civilized society,'" and may therefore be inconsistent with the high standard New York state has established for claims of intentional infliction of emotional distress. *Bender*, 78 F.3d at 791. These three cases and others from the same era significantly predate the Court of Appeals' 1993 decision in *Howell v. New York Post Co.*, 81 N.Y.2d 115 (1993)). In *Howell*, the Court of Appeals emphasized that the standard is "rigorous, and difficult to satisfy," and observed that every emotional distress claim previously considered by that court "has failed because the alleged conduct was not sufficiently outrageous." 81 N.Y.2d at 122. In the wake of *Howell*, New York courts have become much more stringent in their application of this doctrine. *See Silberstein v. Advance Magazine Publishers, Inc.*, 988 F. Supp. 391, 394 (S.D.N.Y. 1997). Accordingly, a number of courts in this District have questioned the value of *Flatley*, *Flamm*, *Halio*, and other cases of that vintage in determining whether to dismiss a claim of intentional infliction of emotional distress. *See id.*; *Fahmy v. Duane Reade, Inc.*, No. 04-cv-1798, 2005 WL 2338711, at *9 n.1 (S.D.N.Y. Sept. 26, 2005); *Rivera v. Baccarat, Inc.*, No. 95-cv-9478, 1996 WL 251850, at *4 (S.D.N.Y. May 10, 1996).

*Waldron*, the only post-*Howell* case that Slaine cites, is distinguishable. That case involved a panoply of racially-motivated government action, including threats, a police beating, discriminatory building code enforcement, suspicionless surveillance, and culminating in the

demolition of a property plaintiff owned without notice or due process. 862 F. Supp. at 767. These allegations meet the prevailing standard.

In fact, most of the pre-*Howell* cases are also distinguishable. In *Flatley*, the defendant's behavior was so excessive that she was charged with and pled guilty to criminal harassment. 138 A.D.2d at 346. The civil suit was only brought when her activity continued undeterred after the conviction. *Id.* In *Blair*, the confidential information leaked by public officials is left unspecified, but it was sufficiently devastating to force the plaintiff's family to move to another town. 67 Misc. 2d at 253. The facts of *Flamm* describe a lengthy and frightening campaign of stalking and harassment by an unhinged individual. 56 Misc. 2d at 1060–61. Thus, these cases also appear to meet the standard. Even if they are read to suggest that New York's standard for outrageous conduct is (or at least was) not as strict as it seems, they do not compel a different result.[2]

Viewed through *Howell*'s exacting standard and taking all of Slaine's allegations as true and drawing all inferences in her favor, Slaine has failed to allege sufficiently outrageous conduct to sustain a claim for intentional infliction of emotional distress. Her counterclaim is therefore dismissed.

### 2. Negligent Infliction of Emotional Distress

A party can recover for emotional injury resulting from a breach of a duty of care under New York law even if no physical injury occurs. *Taggart v. Costabile*, 131 A.D.3d 243, 255 (N.Y. 2nd Dep't 2015).[3] However, "the mental injury must be 'a direct, rather than a

---

[2] *Halio*, 15 A.D.2d at 63–64, a Second Department case, is harder to distinguish, but it does not bind this Court, and the Second Circuit has noted that its facts do not seem to meet the post-*Howell* standard for intentional infliction of emotional distress. *Bender*, 78 F.3d at 791.

[3] New York recognizes two additional theories by which a party can make out a claim for negligent infliction of emotional distress. *Taggart*, 131 A.D.3d at 252. These theories—the "zone-of-danger" rule and

consequential, result of the breach,' and the claim must possess 'some guarantee of genuineness.'" *Id.* at 255–256 (citations omitted) (quoting *Kennedy v. McKesson Co.*, 58 N.Y.2d 500, 506 (1983) and *Ferrara v. Galluchio*, 5 N.Y.2d 16, 21 (1958)). The "guarantee of genuineness" element can be satisfied either by showing a particular kind of negligence recognized by the courts (*e.g.*, mishandling of a corpse; transmitting false information that a loved one has died), or by showing that a breach of duty owed to the injured party endangered that party's physical safety or caused them to fear for their physical safety. *Id.* at 253. The purpose of the direct link and "guarantee of genuineness" requirements is "to filter out petty and trivial complaints and to ensure that the alleged emotional distress is real." *Id.*

Slaine has failed to allege any threat to or fear for her personal safety. Nor has she pointed to any type of negligent behavior recognized by New York courts as creating compensable emotional distress. Accordingly, she has failed to adequately plead the "guarantee of genuineness" element required to show negligent infliction of emotional distress. Slaine's counterclaim for negligent infliction of emotional distress is dismissed for failure to state a claim.

### III.  Motion to Strike Affirmative Defenses

The Answer includes thirty-four affirmative defenses against the claims in the Complaint. De Sesto moved to strike sixteen of these defenses, numbered 2, 3, 10, 15, 18–22, 25, 27, and 30–34. In her opposition to the motion to strike, Slaine seeks leave to amend the answer to withdraw the affirmative defenses numbered 3, 10, 15, 18, 21, 22, 25, 27, 32, and 34. Slaine Br. at 24 n.8. That request is granted. Slaine's briefing is silent as to affirmative defense 19.

---

"situations where a third party is physically injured through the violation of some duty which causes only financial or emotional harm to the plaintiff"—are not relevant to this case. *Id.*

13

Because Slaine has not responded to De Sesto's arguments regarding this affirmative defense, "the Court deems this defense abandoned," and the motion to strike it is granted. *Allstate Ins. Co. v. Long Island Power Auth.*, No. 14-cv-0444, 2015 WL 867064, at *4 (E.D.N.Y. Feb. 27, 2015). The Court now turns to those affirmative defenses contested in Slaine's briefing, numbered 2, 20, 30, 31, and 33.

The five contested affirmative defenses are as follows:

- No. 2: "Any damages purportedly suffered by Plaintiff are a result of her own action or inaction and/or negligence, or the negligence of third parties beyond Defendant's control." Answer ¶ 74.

- No. 20: "Plaintiff's claims are barred due to her own intentional misrepresentations." *Id.* ¶ 92.

- No. 30: "Plaintiff's claims are barred because Plaintiff represented the hours worked, expenses incurred, and amounts purportedly owed to Plaintiff by Ms. Slaine." *Id.* ¶ 102.

- No. 31: "Plaintiff's claims are barred because Plaintiff was required to record the hours worked and submit to Defendant pursuant to prevailing law, including, but not limited to, 29 C.F.R. § 552.110(d)." *Id.* ¶ 103.

- No. 33: "Plaintiff's claims are barred by the doctrine of *In Pari Delicto*." *Id.* ¶ 105. "The doctrine of *in pari delicto,* a term meaning 'of equal fault,' reflects the principle that a plaintiff who has participated in wrongdoing equally with another person may not recover from that other person damages resulting from the wrongdoing." *Republic of Iraq v. ABB AG*, 768 F.3d 145, 160 (2d Cir. 2014).

All five affirmative defenses involve the same underlying theory: Slaine should not be liable to De Sesto for overtime wages because it was De Sesto's fault that Slaine did not know about the

14

overtime. De Sesto raises two arguments against these defenses. Insofar as the defenses are based on a failure to accurately report time worked, De Sesto argues that they must be struck because employers have a non-delegable duty to maintain accurate records themselves. And insofar as the defenses allege that De Sesto engaged in fraudulent behavior, they must be struck for failure to meet the particularity requirements of Rule 9(b).

### A. Legal Standard

Under Rule 12(f), the Court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Motions to strike affirmative defenses under Rule 12(f) are disfavored, and the standard for a plaintiff to prevail is demanding. *Tardif v. City of New York*, 302 F.R.D. 31–32 (S.D.N.Y. 2014). For the Court to strike an affirmative defense, "(1) there may be no question of fact which might allow the defense to succeed; (2) there may be no substantial question of law, a resolution of which could allow the defense to succeed; and (3) the moving party must show that it is prejudiced by the inclusion of the defense." *Cognex Corp. v. Microscan Sys. Inc.*, 990 F. Supp. 2d 408, 418 (S.D.N.Y. 2013). However, affirmative defenses alleging fraud must be pled with particularity as required by Rule 9(b), or be struck as inadequately pled. *Erickson Beamon Ltd. v. CMG Worldwide, Inc.*, No. 12-cv-5105, 2014 WL 3950897, at *5 (S.D.N.Y. Aug. 13, 2014).

### B. Misreporting Defenses

To succeed in a FLSA claim for unpaid overtime, "a plaintiff must prove that he performed work for which he was not properly compensated, and that the employer had actual or constructive knowledge of that work." *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 361 (2d

Cir. 2011).[4] FLSA requires employers to be conscientious, not clairvoyant. The requirement to pay overtime wages kicks in only "once an employer knows or has reason to know that an employee is working overtime." *Id.* at 363. However, an employer who *does* have that knowledge "cannot deny compensation simply because the employee failed to properly record or claim his overtime hours." *Id.* If an employer with knowledge of overtime "does not desire the work be done, [she] has a duty to make every effort to prevent its performance," and breach of this duty will make her liable for unpaid overtime. *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 288 (2d Cir. 2008). "This duty arises even where the employer has not requested the overtime be performed or does not desire the employee to work, or where the employee fails to report his overtime hours." *Id.* Although an employee's failure to report overtime hours may contribute to a finding that her employer lacked knowledge, it does not bar a finding that the employer did have knowledge—even if the employee misreported the hours she worked. *See Kuebel*, 643 F.3d at 365 (employer's knowledge was triable issue of fact even though employee misreported hours worked). The authorities cited by Slaine are not to the contrary. Slaine Br. at 20–21. These are simply cases where courts found that the employer lacked knowledge of overtime, and none suggest that inadequate reporting would excuse an employer who knew that unreported overtime was being performed. *See, e.g., Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413, 414 (9th Cir. 1981) ("[W]here an employer has no knowledge that an employee is engaging in overtime work . . . the employer's failure to pay for the overtime hours is not a violation of [the FLSA].").

---

[4] The analysis in this section is phrased in terms of the FLSA, but it applies equally to overtime claims under NYLL. *See Kuebel*, 643 F.3d at 357 n.2 (citing *Reiseck v. Universal Commc'ns of Miami, Inc.*, 591 F.3d 101, 105 (2d Cir. 2010)) (observing that "NYLL mandates overtime pay in same manner as FLSA").

If Slaine genuinely lacked actual or constructive knowledge that De Sesto was working overtime, she would have had no obligation to pay. But demonstrating this knowledge is simply part of De Sesto's *prima facie* case. If De Sesto *can* show knowledge, then her negligence in reporting her hours (Defense No. 2) or (mis)representations that she was not working overtime (Defense Nos. 20 & 30) or failure to comply with any record-keeping requirements (Defense No. 31) will be of no avail to Slaine. If an argument can at most "negate an element of the plaintiff's claim, it is not appropriately considered an affirmative defense." *Etienne v. Wal-Mart Stores, Inc.*, 197 F.R.D. 217, 221 (D. Conn. 2000). The correct remedy, however, "is not to strike the averment, but rather to treat it as a specific denial." *Id.* (citing Wright & Miller, 5 Federal Practice and Procedure Civil § 1269 (2d ed. 1990)). Accordingly, Defenses Nos. 2, 20, 30, and 31 will be treated as specific denials.

### C. Fraud Defenses

As noted above, affirmative defenses alleging fraud must meet the heightened pleading requirements of Rule 9(b). *Erickson Beamon*, 2014 WL 3950897, at *5. Slaine's affirmative defenses numbered 20 (intentional misrepresentation) and 33 (*in pari delicto*), both rest on the premise that De Sesto fraudulently misreported her hours worked and expenses while in Slaine's employ. These defenses sound in fraud. The Court strikes defense number 30 as inadequately pled for the same reason that the overpayment counterclaims were dismissed above. The Court need not strike defense number 20 because it is properly converted to a specific denial.

### IV.   Conclusion

For the reasons set forth above, De Sesto's motion to dismiss Slaine's counterclaims and strike certain affirmative defenses is granted in part and denied in part. Slaine's common law

17

fraud, unjust enrichment, breach of fiduciary duty, and civil theft counterclaims are dismissed without prejudice. The counterclaims alleging intentional and negligent infliction of emotional distress are dismissed with prejudice. The Court grants Slaine leave to withdraw the affirmative defenses numbered 3, 10, 15, 18, 21, 22, 25, 27, 32, and 34. The affirmative defenses numbered 2, 20, 30, and 31 are converted to specific denials. The affirmative defenses numbered 19 and 33 are struck. If Slaine repleads her overpayment counterclaims, she may also replead affirmative defense 33. If Slaine chooses to amend her pleading, she must do so no later than April 1, 2016. This resolves Dkt. No. 19.

SO ORDERED.

Dated: March 18, 2016
New York, New York

_____
ALISON J. NATHAN
United States District Judge